FARWELL *v.* THE HOUGHTON COPPER WORKS and others.

*(Circuit Court, W. D. Michigan, N. D.  July 12, 1881.)*

1. BOARD OF DIRECTORS IMPROPERLY CONVENED—ACTION TAKEN BY, UNAUTHORIZED.

Where a by-law of a corporation required its secretary to give due notice of meetings of the board of directors, *held*, that important action taken at a meeting from which a director, whom the secretary made no attempt to notify that such a meeting was to be held, was absent, is unauthorized.

2. BONA FIDE PURCHASER WITHOUT NOTICE—WHO IS NOT.

The purchaser, a former shareholder, was present at the meeting of the board at which the sale was made, and knew that one of the directors was away. He was bound to know that absent directors must be notified of board meetings. Held, that he was not a *bona fide* purchaser without notice.

3. STOCK BOUGHT BY THE CORPORATION—WHEN ENTITLED TO VOTE.

It seems that stock bought by the corporation for non-payment of assessments is entitled to vote only when all the stock is represented at the meeting, and all consent to have the treasurer cast the vote.

4. NOMINAL SUBSCRIPTIONS.

Stock thus subscribed for is not to be counted in taking a stock vote.

5. EVIDENCE.

The records of a corporation are *prima facie* evidence against stockholders of its acts recorded therein.

Section 2847 of the Compiled Laws of Michigan, in so far as it provides for the due filing of proxies, is directory only.

In Equity. Hearing on pleadings and proofs.

*Dan. H. Ball* and *G. V. N. Lothrop*, for complainant.

*T. L. Chadbourne* and *Ashley Pond*, for all defendants except the Houghton Copper Works.

WITHEY, D. J. The Houghton Copper Works was organized under the laws of Michigan in 1871, among other things, for the purpose of manufacturing copper, with a capital stock of $250,000, divided into 10,000 shares of $25 each. Complainant is a stockholder, and brings this suit to set aside a sale made by a majority of the directors to defendant Edwards, October 6, 1879, for the price of $10,000. The sale comprised all the real estate, works, and property of the company. The object sought to be accomplished was to close out the property and wind up the business, and such is manifestly the effect if the sale is valid. The sale is attacked principally upon three grounds:

(1) That it was made without authority of the stockholders, inasmuch as three-fifths in interest of the entire stock of the company, at a meeting called for that purpose, did not vote to authorize the sale; (2) that a majority of the directors, convened without notice to all the directors, possessed no power to make the sale; and, lastly, that the sale was fraudulent, it being made with intent to deprive complainant of his rights as a stockholder.

According to the records of the company, the stockholders, September 20, 1875, authorized a sale of all the property of the corporation; but it is said that three-fifths in interest of the entire stock was not represented and did not vote in favor of authorizing the directors to sell. Comp. Laws, § 2888. Whether this objection is valid depends upon two questions:

(1) Whether certain of the capital stock owned by the company, and carried in the name of the treasurer, was to be counted in determining the three-fifths in interest of the entire stock, part of it having been subscribed and immediately transferred to the company to be subsequently disposed of in the interest of the corporation, while other of the stock so held had been purchased at a sale of stock delinquent for non-payment of assessments; (2) whether the *prima facie* evidence made by the records of the stockholders' meeting, stating that 3,387 shares—more than three-fifths, excluding shares owned by the corporation—voted in favor of authorizing the directors to sell, has been rebutted.

The entire capital stock was subscribed at its par value, but, as stated, nearly one-half of the subscriptions were intended to be merely nominal, and such stock was at once transferred to the treasurer for the company, on which, of course, no assessments were paid. None of this stock was, in my opinion, to be counted in determining whether

three-fifths in interest of the entire stock voted to authorize a sale. It was stock only in name, and therefore not entitled to vote. As to the stock bought by the company for non-payment of assessments, there would be less objection; but if voted it should be in such a manner as to represent the interest of every stockholder, for every one of them had an interest in the stock, and was entitled to have his interest voted according to his own views. If the treasurer should exercise the right to vote such stock, it might result in making the action of the meeting adverse to the views of the majority of the stockholders; and it is not seen how it would be practicable to have the stock voted in harmony with the views of all, unless all the stock was represented at the meeting and all consented to have the treasurer cast the vote, and such was not the case.

If the stock owned by the company was not entitled to be voted, the next inquiry is whether the requisite three-fifths of the remaining stock was voted in favor of the resolution authorizing the directors to sell. The record, after setting forth the resolution to be acted on, states that a vote by ballot was taken, and sets it forth after this manner, viz.: "T. W. Edwards, 316 shares; T. W. Edwards, proxy, 5 shares;" and so on until the vote in person and proxy is shown to be 3,387 shares in favor of the resolution, being more than three-fifths, excluding stock owned by the company. Of the stock thus voted, 1,561 shares were voted by proxies. This record is *prima facie* evidence, certainly against stockholders, of the acts of the corporation therein recorded. The officer making up the minutes was the agent of the stockholders, and it is therefore their record of their own action. It may not be conclusive, but if a stockholder seeks to discredit this evidence he must do it by proofs conclusive in character and weight.

Excluding stock owned by the company, it is claimed that three-fifths of the shares did not vote in favor of a sale. The evidence from which such conclusion is urged is mainly that of the 3,387 affirmative votes, 1,561 of the shares were voted by proxies, and that a large number of such proxies are missing from the office of the company, raising the presumption that they never existed, and if not, then the resolution to authorize a sale was not passed by a vote of three-fifths in interest of the stock.

It is said the statute (section 2847) which permits stock to be voted by proxy requires the proxy to be "duly filed." But this must be regarded as directory. If the proxies were present and actually voted, the fact that none of them were filed, or that none of them can

now be found in the company's office, will not defeat the action taken at the meeting. The record states that E. voted a proxy of five shares, and this means that he held a proxy which was present, signed by a holder of five shares of stock, that authorized E. to vote those shares, and that the proxy was deemed sufficient; and so in the case of every share stated to have been voted by proxy.

If the directors were authorized to make a sale of the company's property, the next question is whether a majority of the directors could take the necessary action to sell without notifying the other director of the meeting, either personally or by notice left at his residence. There were five directors, four of whom met and assumed to sell. The fifth director, being temporarily absent from the state, was not notified, nor was there any attempt made to notify him, of the meeting. The statute says:

"A majority of the directors of every such corporation, convened according to the by-laws, shall constitute a quorum for the transaction of business." Section 2847.

The only by-law bearing on the subject relates to the duties of the secretary, viz.:

" The secretary shall give due notice of all meetings of the stockholders and board of directors."

There had been no meeting of the directors for many months; there was no custom to hold directors' meetings on given days, and no rule that business might be transacted whenever a majority should be present. On the contrary, the only by-law on the subject requires a notice of board meetings. In such a condition of local statute and regulations of the company, no business could be transacted by a majority without notice first given to every director. A director not present would be entitled to the opportunity of being present and participating in the business of the meeting. Failure to give him notice not only deprived him of such opportunity, but practically excluded him from all participation in the business transacted. It would hardly be contended that a meeting of directors, at which the majority excluded the minority, could legally transact business affecting the corporation. They had an important duty to discharge, as they were authorized to sell only when the price was by them deemed sufficient; the price was, therefore, a material thing to be determined.

On the question of the action of a majority convened without notice to all the members, see *Wiggins* v. *Baptist Society*, 8 Met. 301; *Stowe* v. *Wise*, 7 Conn. 219; *The State* v. *Ferguson*, 31 N. J. Law, at

p. 124; Angel & Ames on Corp. § 492; Field on Corp. §§ 227, 228, 234; Grant on Corp. 156-7-8.

It is not necessary to determine whether the sale was fraudulent. The majority of the directors acted without authority. Their action operated unjustly upon the rights of complainant and other stockholders, and the purchaser, Edwards, is not in the position of a *bona fide* purchaser, without notice of the actual posture of affairs at the time of the sale A brief statement will show where the equities are, and why a court of equity should afford the relief prayed for against the action of a majority of the directors.

The land and works cost $75,000. The company operated until 1874, when it suspended, heavily indebted. September 20, 1875, a stockholders' meeting was held, and the directors were authorized to sell the entire property of the company whenever they could obtain a satisfactory price. Edwards was then a shareholder, but in 1876 sold his stock to complainant at a price which would make the entire stock worth $50,000. Subsequent to 1876 the directors sold 4,479 shares of stock owned by the company for $12,000, and paid the debts of the company. There was now less urgency, if there was any necessity, to sell the property. Prior to the time of selling the 4,479 shares of stock, the directors fixed the price for all the assets and property at $55,000. After selling the stock and paying the debts, they fixed the price of what remained at $44,000. All this was known to defendant Edwards. One of the directors, but a few months prior to the sale to Edwards, sold to complainant 5,101 shares of the stock for $13,770, a rate which would make the value of the entire stock over $26,000. That the director had made a sale, and for that price, defendant Edwards received information, and the directors were fully advised of the sale, price, and to whom made. They also knew that complainant, had he known of the proposed sale, would be opposed to it. In such a posture of affairs, on the morning of October 6, 1879, Edwards sent a written proposition of $10,000 to the directors for the property. A director, president of the board, was absent from the state. The other four directors met, accepted the proposition, and caused a conveyance to be executed the same day. Edwards was present at the meeting. He was bound to know that notice of a board meeting was necessary, and he knew that one of the directors was not present, and was absent.

The manifest purpose and effect was to circumvent complainant, the owner of a majority of the stock, and deprive him of his rights. The absent director was at once informed of the sale, and not only

promptly refused to acquiesce, but repudiated what had been done. When this suit was commenced, Edwards had paid but $2,000 of the purchase price, but paid the balance, $8,000, after being fully advised of the matters set up in the bill of complaint. It is in the power of the corporation to refund the purchase money, and this should be done.

Complainant is entitled to a decree setting aside the sale, and for a conveyance of the property to the Houghton Copper Works, making the injunction perpetual, and referring the cause to a master to take proofs and state an account for the use of the property. The Houghton Copper Works is to be decreed to refund the purchase price paid by defendant Edwards, less whatever may be found owing from him for the use of the property, for which use Edwards is to account and pay.